919 THIRD AVENUE NEW YORK, NY 10022-3908

JENNER&BLOCK LLP

February 22, 2019

Michael W. Ross
Tel. +1 212 891 1669
MRoss@jenner.com

The Honorable Sanket J. Bulsara
Eastern District of New York
225 Cadman Plaza
Brooklyn, New York 11201

Re: *Latisha Sanders v. The City of New York, et al.*
Civil Action No.: 16-CV-6526 (Amon, J.) (Bulsara, M.J.)

Dear Magistrate Judge Bulsara:

In response to the Court's request, we were retained by Plaintiff Latisha Sanders as *pro bono* counsel for the purpose of handling depositions in the above-referenced action. In that capacity, we are writing to seek limited relief from this Court's October 15, 2018 Order staying discovery with respect to Defendant Brookdale University Hospital ("Brookdale"). *See* Docket Entry ("DE") 64. Specifically, we request that the stay be lifted for the limited purpose of permitting a Rule 30(b)(6) deposition of Brookdale concerning the issues central to Ms. Sanders' claims. Whether a defendant or not, Brookdale is at the center of those claims and Ms. Sanders is therefore entitled to discovery from Brookdale to support them. We consulted with counsel for Defendant Brookdale in good faith regarding this application for a limited exception to the stay of discovery, and Brookdale's counsel opposes this request.

## I. Background Information

Plaintiff last saw her 17-year-old son, Cedric McEaddy, alive on the morning of May 18, 2016. DE 54 (hereinafter, "Am. Compl.") at 11. After suffering multiple gunshot wounds later that evening, Cedric arrived at Brookdale in an ambulance just after midnight on May 19. *Id.* at 4–5; Ex. A at 1. Resuscitation attempts by Defendant Sandra Sicular, MD, and other Brookdale staff were unsuccessful, and Dr. Sicular pronounced Cedric's death at 12:33 a.m. *Id.*; Ex. AA at 1; Ex. EE at 1. What happened to Cedric's body during the time between his death and when his mother finally gained access to his body nine days later is the focus of the claims asserted in this case.

Ms. Sanders' Experience at Brookdale

Ms. Sanders arrived at Brookdale at 3:45 a.m. on the night of her son's death. Upon arrival, she learned from her mother—who had gotten there about an hour earlier—that a "Detective Walker" had said that Cedric's body was on hold and could not be viewed by a family member without authorization from the Office of the Chief Medical Examiner ("OCME") or from the detective on the case. *See id.* at 19. When Ms. Sanders herself inquired with Brookdale staff about seeing her son's body, they told her that OCME and the assigned detectives were present in the hospital but not responding to pages. *Id.* at 19. As Ms. Sanders waited at Brookdale over the

The Honorable Sanket J. Bulsara
February 22, 2019
Page 2

ensuing hours, her son's body periodically moved from unit to unit within the hospital. *See* Ex. H at 1; Ex. I at 1. At 6:50 a.m., a Brookdale attending physician told Ms. Sanders to go home and "give yourself time to grieve and return to the hospital in three days with funeral arrangements." Am. Compl. at 17–18.

Referral for Organ Donation

In the meantime, Brookdale and OCME had initiated a referral of Cedric's body to LiveOnNewYork ("LONY"), an organ procurement organization, without Ms. Sanders' knowledge. At 1:30 a.m. that night, Defendant Althea Coggins, RN, notified LONY that the hospital was in possession of Cedric's body. Ex. J at 1. By 6:07 a.m., Brookdale personnel informed LONY that they did not have next-of-kin information for Cedric, DE 59-5 at *6–7, even though Ms. Sanders was waiting in the hospital, and even though Brookdale personnel recorded in their systems as early as 1:05 a.m. that the "[a]uthorities" had identified Cedric's "family members," Ex. FF at 1. After Brookdale advised LONY that it lacked information regarding Cedric's next-of-kin, at 6:45 a.m., LONY requested that a "hold" be put on Cedric's body so that the organization could, on its own, review records to attempt to identify a next-of-kin who could authorize tissue donation. Ex. I at 1; DE 59-5 at *7. That hold remained in place until 10 a.m. Ex. I at 1. What happened to the body during that time period is unclear.

Transfer of Cedric's Body

According to OCME records, at 12:00 p.m. that afternoon, the OCME transportation unit was dispatched to Brookdale, presumably to retrieve Cedric's body, and a half hour later reached the "scene." Ex. I at 1. The OCME records then include numerous additional entries indicating that there was a "reassign[ment]" made, that the OCME investigation unit became involved in attempting to obtain Cedric's body and personal effects, that the OCME transportation unit made a second visit to the "scene," and that Cedric's body finally reached the OCME office at Kings County Hospital at 7:09 p.m.[1] *Id.* In short, although Brookdale's records say that Cedric's body was "released" to the OCME at 6:00 a.m., his body did not reach the OCME facility at Kings County Hospital until more than thirteen hours later.

During that period, Ms. Sanders returned to Brookdale. She arrived at the hospital at 2:30 p.m. When she got there, Brookdale staff informed her that Cedric's body had been discharged as an "unclaimed, unknown" 20-year-old male to an unknown party—even though Brookdale and OCME records showed that his body was *not* unidentified and that it had been released to the OCME. Am. Compl. at 8-9. They suggested that the body may have been taken to Kings County Hospital. *Id*. Ms. Sanders then traveled to Kings County Hospital where she was told that no one by Cedric's name or matching his description had been admitted; she was instructed to check with the OCME office there. *Id.* at 9. When Ms. Sanders inquired with the OCME about her son's

---

[1] OCME at Kings County Hospital shares a campus and is affiliated with SUNY Downstate College of Medicine, which, according to LONY's website, is one of ten organ transplant centers that partners with LONY. *See* https://www.liveonny.org/who-we-are/#the-liveonny-foundation (last accessed on Feb. 21, 2019).

2

The Honorable Sanket J. Bulsara
February 22, 2019
Page 3

body at 3:30 p.m., OCME staff told her that that no one by his name or matching his description was on their scheduled list, and that she should return in two days to see if Brookdale had released his body to the OCME by that time. *Id.*

### Ms. Sanders Sees a Photograph of Cedric's Body

As instructed by the OCME, Ms. Sanders returned two days later, on May 21. At that time, OCME staff showed her a photograph of a face that she identified as her son. *Id.* at 7; Ex. G at 1. She did not view Cedric's body at that time.

### Ms. Sanders Finally Gains Access to Her Son's Body

The OCME did not release Cedric's body until May 27. On that day, the body was released to Defendant Jason Sheppard (owner of Defendant Fairhaven Memorial Chapel, LLC ("Fairhaven")), whom Ms. Sanders had engaged to carry out the funeral arrangements. Am. Compl. at 14, 15. Ms. Sanders finally obtained access to Cedric's body the next day, May 28, nine days after his death.[2]

When Ms. Sanders finally viewed Cedric's body in person at Fairhaven on May 28, it was unrecognizable to her: the body appeared grossly disfigured, and the face, which appeared "bruised and burned," resembled neither her son when alive nor the picture that she had been shown by the OCME. *Id.* at 8, 15–16. Sheppard immediately exclaimed that "It wasn't me, it was the Medical Examiner!" *Id.* at 15. Ms. Sanders started to cry, asking, "Who the hell is this?" Sheppard responded by explaining he had not wanted her to see the body in such a state, and that his assistant had just finished the embalming process. *Id.* at 15–16. Ultimately, Cedric's body was transferred to another funeral home.

## II.  Plaintiff Should Be Granted a 30(b)(6) Deposition of Brookdale

As the above facts make clear, Brookdale is at the center of Ms. Sanders' constitutional and state law claims that she was denied access to her son's body and that it was unlawfully mutilated without her consent.[3] For a substantial period of time after Cedric's death, his body was

---

[2] On May 26, Detectives Ortiz and Nash visited Plaintiff's home to apologize for failing to notify her about Cedric's death, explaining that the delay was the result of being unable to obtain a proper fingerprint from the body. *See* Am. Compl. at 18.

[3] Ms. Sanders alleges that she was denied access to her son's body and that his body was improperly handled and mutilated without her consent, in violation of her constitutional rights and state law, claims that are grounded on well-recognized legal theories. *See Shipley v. City of New York,* 25 N.Y.3d 645, 653 (2015) ("The common-law right of sepulcher affords the deceased's next of kin an 'absolute right to the immediate possession of a decedent's body for preservation and burial . . . and damages may be awarded against any person who unlawfully interferes with that right or improperly deals with the decedent's body.'"); *Helmer v. Middaugh,* 191 F. Supp. 2d 283, 285–86 (N.D.N.Y. 2002) (acknowledging violation of common-law right of sepulcher as basis for § 1983 action); *see also Newman v. Sathyavaglswaran,* 287 F.3d 786, 788 (9th Cir. 2002) (holding that parents, as "the next-of-kin have the exclusive right to possess the bodies of their deceased family members . . . the deprivation of which must be accorded due process of law under the

3

The Honorable Sanket J. Bulsara
February 22, 2019
Page 4

in the custody of Brookdale, during which time Brookdale staff initiated a referral to LONY about organ and tissue donation—indicating ignorance about his next-of-kin—even while Ms. Sanders was in the waiting room being told she could not access his body. And, although Brookdale "released" Cedric's body to the OCME at 6:00 a.m. the morning after his death, his body did not reach the OCME's office at Kings County Hospital until after 7:00 p.m. that night, calling into question whether the transfer was properly effectuated and what happened to the body during that lengthy period of time. Discovery into these matters is key to Ms. Sanders' allegations, and she is proposing targeted discovery—in the form of a Rule 30(b)(6) deposition—that will efficiently begin to gather that important information.

For several reasons, Ms. Sanders' request should be granted.

*First*, although the Court granted a stay of discovery for Brookdale pending a decision on its dispositive motion, Brookdale will be subject to discovery regardless of whether that motion is granted or denied. *See Hachette Distribution, Inc. v. Hudson Cnty. News Co.*, 136 F.R.D. 356, 359 (E.D.N.Y. 1991) (in denying defendants' motion to stay discovery pending adjudication of their dispositive motion, the court gave "significant" weight to the fact that "discovery of [relevant party] is inevitable, whether or not they remain in the case as parties[,]" because they were "at the very least, material witnesses in th[e] litigation based on the allegations in the complaint"). Here, Brookdale was the location of, and its personnel direct participants in or material witnesses to, key events giving rise to many of Ms. Sanders' claims. Relevant topics include information about Brookdale's practices and procedures pertaining to organ and tissue donation (and why it was initiated here); the transfer of deceased bodies to the OCME and how that was carried out in this case; information about the whereabouts of Cedric's body during the period when it was on Brookdale premises; and the interpretation of Brookdale documents in the record. Discovery from Brookdale will therefore be needed in this case, regardless of the hospital's status as a defendant. *See* Fed. R. Civ. P. 45(a); *FTC v. Vantage Point Servs.,* No. 15 CV-6S(Sr), 2016 WL 3397717, at *2 (W.D.N.Y. June 20, 2016) (recognizing a subpoena as mechanism for obtaining a Rule 30(b)(6) deposition of a nonparty).

*Second,* delaying this limited discovery from Brookdale would be prejudicial to Ms. Sanders. Ms. Sanders is in the process of pursuing discovery from the non-stayed defendants, and her counsel is preparing depositions of various personnel. In order to properly understand, prepare for, and contextualize the information received from the non-stayed defendants, it will be important to obtain basic discovery from Brookdale regarding what happened to Cedric's body, and why, during the period in which it was at the hospital. Ms. Sanders should not have to proceed with depositions of OCME personnel without having had the opportunity also to depose Brookdale regarding basic facts about its interactions with the OCME and about what happened to the body before the OCME received it. Moreover, the relief requested—a Rule 30(b)(6) deposition—is limited in scope and therefore will not prejudice or impose undue burden on Brookdale.

---

Fourteenth Amendment of the United States Constitution" and that the alleged deprivation of that right states a claim under § 1983).

The Honorable Sanket J. Bulsara
February 22, 2019
Page 5

*Third,* it is by no means clear that Brookdale's dispositive motion will or should be granted, or that, if it is, further facts could not be pleaded to address any infirmities. By way of limited example:

- Brookdale contends that Ms. Sanders cannot succeed on her organ harvesting and donation claims because "nowhere in [Brookdale's] medical records . . . is there any indication that organs, tissue, or corneas were removed from Mr. McEaddy's body at any time while [it] was at Brookdale . . . ." DE 60-10 at *28–29. But the absence of an express reference to the harvesting of Cedric's bodily materials in the records that Brookdale has provided is not alone dispositive of her claims, particularly in light of the circumstantial evidence described above.

- Brookdale contends that Ms. Sanders' "claim for violation of her right to sepulcher is invalid because Mr. McEaddy's body was accounted for at all times and was never lost [while] at [] Brookdale . . ." DE 60-10 at *11. But the available records belie that assertion. The location of his body between the time of its "discharge" from Brookdale at 6:00 a.m. and its arrival at the OCME at Kings County Hospital at 7:09 p.m. is far from clear and remains in dispute.

- Brookdale contends that Ms. Sanders' claim for violation of her right to sepulcher is also invalid because Cedric's "next of kin were promptly notified of [his] death." *Id.*, see also *id.* at 38-39. But this assertion is contradicted not only by Ms. Sanders' allegations, but also by facts alleged in Brookdale's own dispositive motion, which, relying on LONY records and LONY's dispositive motion, states that LONY "was not able to locate information about the next-of-kin, so it was not able to ask for authorization for tissue donation" several hours after Cedric's death, while his body was still in the custody of Brookdale. *Id.* at 18 (citing Ex. E (LONY Record LONY005); Ex. F (DE 59-5 at *6–7); DE 60-9 at *4).

The purpose of discovery is to permit a party to seek information about such disputed factual issues.

### III. Conclusion

For the foregoing reasons, Plaintiff respectfully requests limited relief from the Court's stay of discovery against Brookdale, so that she may conduct a Rule 30(b)(6) deposition.

Respectfully Submitted,

*/s/ Michael W. Ross*

Michael W. Ross
*Pro Bono Deposition Counsel for Plaintiff*