UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
LATISHA SANDERS, *on behalf of herself and the*
*estate of Cedric McEaddy,*

                         Plaintiff,

               *v.*

THE CITY OF NEW YORK, THE STATE OF NEW
YORK, THE UNITED STATES, JASON SHEPPARD,
ZINC TECH LAB, DR. AGLAE CHARLOT, HAMMER,
LIVEONNY, CORRECTION OFFICER MORRIS,
BROOKDALE UNIVERSITY HOSPITAL AND
MEDICAL CENTER, MARGARET CHIN, 67TH
PRECINCT, NEW YORK POLICE DEPARTMENT,
OFFICE OF CHIEF MEDICAL EXAMINER,
DETECTIVE ORTIZ, ALTHEA COGGINS, R.N., and
SANDRA SICULAR, M.D.,

                       Defendants.
-----------------------------------------------------------------X

**REPORT &
RECOMMENDATION**
16-CV-6526-CBA-SJB

**BULSARA, United States Magistrate Judge:**

     Following the death of her minor son, Cedric McEaddy, plaintiff Latisha Sanders

("Sanders"), proceeding *pro se*, commenced this action against LiveOnNY ("LiveOn"),

an organ procurement organization ("OPO"), and the Office of the Chief Medical

Examiner ("OCME"), among other parties, for allegedly interfering with her right of

access to her son's body and illegally harvesting his organs.[1]  All Defendants, except for

---

[1] Am. Compl. ("Am. Compl."), Dkt. No. 54 ¶¶ 2–8, 12.  The original complaint
named the City of New York, the State of New York, the United States, Fairhaven
Memorial Chapel, Zinc Tech Lab, Dr. Aglae Charlot, Hammer, LiveOn, Correction
Officer Morris of the City of New York Department of Investigation, Brookdale
University Hospital and Medical Center, Margaret Chin, and the 67th Precinct of the
New York City Police Department as defendants.  (Compl. dated Aug. 8, 2016
("Compl."), Dkt. No. 2).  Zinc Tech Lab, the State of New York, the City of New York, the
United States, Margaret Chin, and Correction Officer Morris were not named in the
Amended Complaint and were dismissed on September 7, 2018, the day the Amended
Complaint became the operative complaint.  (Order dated Sept. 7, 2018; Am. Compl.).

LiveOn, have been dismissed or have settled with Sanders.[2]  On January 14, 2021,

LiveOn moved for summary judgment on the sole claim pending against it: loss of right

of sepulcher.[3]

The Honorable Carol Bagley Amon referred the motion to the undersigned for

report and recommendation.[4]  Sanders alleges LiveOn communicated a 13-hour "hold"

to the OCME, directing it to halt any autopsy so that LiveOn could obtain consent for

organ and tissue donation; in so doing, LiveOn delayed access to her son's body and

violated her right of sepulcher.[5]  She also claims that LiveOn illegally harvested her son's

organs.[6]  LiveOn contends that its "hold" had no effect on Sanders' access to her son's

body, it did not harvest any organs or tissue, and it is immune from liability for

interfering with a right of sepulcher.[7]  Although there is no evidence of any harvesting,

LiveOn is not entitled to immunity, and there are material issues of fact about the effect

---

[2] Stip. and Order of Dismissal dated Nov. 12, 2019, Dkt. No. 148 (Dr. Aglae Charlot, the OCME, and Detective Ortiz); Stip. of Discontinuance dated Nov. 19, 2019, Dkt. No. 152 (Brookdale University Hospital and Medical Center); Stip. of Discontinuance dated Nov. 19, 2019, Dkt. No. 153 (Sandra Sicular, M.D.); Stip. of Discontinuance dated Nov. 19, 2019, Dkt. No. 154 (Althea Coggins, R.N.); Stip. of Dismissal, Dkt. No. 165 (Fairhaven Memorial Chapel and Jason Sheppard).

[3] LiveOnNY's Notice of Mot. for Summ. J. Pursuant to Rule 56 dated Nov. 25, 2020 ("Mot."), Dkt. No. 183).  The Court dismissed all other claims against LiveOn on September 30, 2019.  (Mem. & Order dated Sept. 30, 2019, Dkt. No. 133 at 25–26).

[4] Order Referring Mot. dated Jan. 21, 2021.

[5] Pl.'s Mem. of Law in Opp'n to Def.'s Mot. dated Dec. 30, 2020 ("Opp'n"), attached to Pl.'s Notice of Opp'n to Def.'s Mot. dated Dec. 30, 2020 ("Pl.'s Notice"), Dkt. No. 181 at 2, 10–11, 16–17.

[6] *Id.* at 12.

[7] *See generally* LiveOnNY's Mem. of Law in Supp. of its Mot. for Summ. J. dated Nov. 25, 2020 ("Mem."), attached to Mot., Dkt. No. 183.

its "hold" had on Sanders' access to her son's body.  As such, it is respectfully recommended that LiveOn's motion be denied.

<u>STANDARD FOR SUMMARY JUDGMENT</u>

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "In determining whether summary judgment is appropriate, [the Court] must resolve all ambiguities and draw all reasonable inferences against the moving party." *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

In this case, Sanders is proceeding *pro se*, and although she had counsel earlier in the case, she responded to this motion without representation.  Although the same standards for summary judgment apply, a "*pro se* litigant[ ] should be given special latitude in responding to [a summary judgment] motion." *Gonzalez v. Long*, 889 F. Supp. 639, 642 (E.D.N.Y. 1995); *accord Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988) ("[S]pecial solitude should be afforded *pro se* litigants generally, when confronted with motions for summary judgment."); *see also, e.g.*, *Tomassi v. Nassau County*, No. 15-CV-3652, 2019 WL 1440898, at *6 (E.D.N.Y. Mar. 15, 2019) ("Here, given Plaintiff's *pro se* status, the Court exercises its broad discretion and conducts a review of the record to evaluate whether the facts contained in Defendants' Rule 56.1

Statement are uncontroverted.  The Court deems admitted only those facts which are supported by the admissible evidence and not controverted by other admissible evidence in the record."), *report and recommendation adopted*, 2019 WL 1440154 (Mar. 29, 2019); *Forbes v. Dressel*, No. 06-CV-14387, 2009 WL 73121, at *3 (S.D.N.Y. Jan. 5, 2009) ("I have construed *pro se* plaintiff's pleadings liberally and resolved all ambiguities in his favor.").

The movant bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" in one of two ways.  Fed. R. Civ. P. 56(c)(1).  It may cite to portions of the record, "including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials."  *Id.* r. 56(c)(1)(A).  Alternatively, it may "show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  *Id.* r. 56(c)(1)(B).

In moving for summary judgment or answering such a motion, litigants in this District are required by the Local Rules to provide a statement setting forth purported undisputed facts or, if controverting any fact, responding to each assertion.  *See* Local Civil Rule 56.1(a)–(b).  In both instances, the party must support its position by citing to admissible evidence from the record.  *Id.* r. 56.1(d); *see also* Fed. R. Civ. P. 56(c) (requiring reliance on admissible evidence in the record in supporting or controverting a purported material fact).  "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to

hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001).

Where claims in opposing Rule 56.1 statements are "genuinely disputed," the Court will consider the evidentiary sources of the claims. *Halberg v. United Behav. Health*, 408 F. Supp. 3d 118, 146 (E.D.N.Y. 2019) (adopting report and recommendation), *appeal withdrawn*, 2020 WL 1987820 (2d Cir. Mar. 18, 2020). In evaluating the sources of claims made in dueling Rule 56.1 statements, the Court cannot—as is true for the summary judgment motion as a whole—weigh evidence or assess the credibility of witnesses. *See United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994). "Legal arguments are impermissible in any Rule 56.1 Statement and are to be disregarded." *Taveras v. HRV Mgmt., Inc.*, No. 17-CV-5211, 2020 WL 1501777, at *2 (E.D.N.Y. Mar. 24, 2020); *Lawrence v. Cont'l Cas. Co.*, No. 12-CV-412, 2013 WL 4458755, at *1 n.1 (E.D.N.Y. Aug. 16, 2013) ("Both parties have submitted Local Rule 56.1 statements and responses to each other's statements that mix factual assertions with legal argument and therefore fail to meet the requirements of Local Rule 56.1. The facts . . . are taken from those assertions contained in the Local Rule 56.1 statements that comply with Local Rule 56.1[.]" (citations omitted)). The Court must also disregard conclusory denials that lack citations to admissible evidence. *Rodriguez v. Schneider*, No. 95-CV-4083, 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999) ("*Rule 56.1 statements are not argument.* They should contain factual assertions, with citation to the record. They should not contain conclusions[.]"), *aff'd*, 56 F. App'x 27 (2d Cir. 2003). Further, where the opposing party fails to specifically controvert a numbered paragraph in the Rule 56.1 statement, the statement by the moving party "will be deemed to be admitted." Local Civil Rule 56.1(c). The Court also does not give any

consideration to hearsay, speculation, or inadmissible evidence in evaluating

declarations or affidavits. *Pacenza v. IBM Corp.*, 363 F. App'x 128, 130 (2d Cir. 2010)

("[A] court is obliged not to consider inadmissible evidence at the summary judgment

stage[.]"); *Crawford v. Dep't of Investigation*, No. 05-CV-5368, 2007 WL 2850512, at

*2 (S.D.N.Y. Oct. 1, 2007) ("'[A] non-moving party 'must set forth specific facts showing

that there is a genuine issue for trial;' he or she 'may not rely on mere conclusory

allegations nor speculation, but instead must offer some hard evidence showing that its

version of the events is not wholly fanciful.'" (quoting *Woodman v. WWOR-TV, Inc.*, 411

F.3d 69, 75 (2d Cir. 2005))), *aff'd*, 324 F. App'x 139 (2d Cir. 2009).[8]

---

[8] Sanders provided a counterstatement of facts. (Pl. Proposed Finding of Facts Br. dated Dec. 30, 2020 ("Pl.'s Rule 56.1 Statement"), Dkt. No. 182). LiveOn then submitted a reply Rule 56.1 statement that responded to the counterstatement of facts. (Def.'s Resp. to Pl.'s Local Rule 56.1 Statement of Undisputed Facts dated Jan. 13, 2021 ("Def. s' Reply Rule 56.1 Statement"), attached to Def.'s Reply Mem. of Law in Further Supp. of Its Mot., Dkt. No. 184). There is nothing wrong with that. But LiveOn proceeded to reply, *i.e.*, support anew, their original Rule 56.1 statement, including by providing argument and citing to exhibits. Of greater significance, Local Rule 56.1 does not permit the filing of reply Rule 56.1 statements, as Defendants have done. *Cap. Recs., LLC v. Vimeo, LLC*, No. 09-CV-10101, 2018 WL 4659475, at *1 (S.D.N.Y. Sept. 10, 2018) ("Local Civil Rule 56.1 does not provide for a 'reply' in further support of a Rule 56.1 statement of undisputed facts."). A reply Rule 56.1 Statement is "a procedurally improper attempt to have the last word in a manner that is not contemplated by the local rules." *Killis v. Cabela's Retail II, Inc.*, No. 13-CV-6532, 2015 WL 128098, at *1 (N.D. Ill. Jan. 8, 2015) (rules substantively similar to EDNY). As such, the Court declines to consider the reply Rule 56.1 statement except to the extent it responded to the new facts in Sanders' Rule 56.1 statement or the evidence cited is contained in the materials provided to the Court, which it has independently reviewed. *See Lincoln Nat'l Life Ins. Co. v. TCF Nat'l Bank*, 875 F. Supp. 2d 817, 820 n.1 (N.D. Ill. 2012) (finding reply Rule 56.1 Statements are inconsistent with burden-shifting Rule 56, highly unusual, and unauthorized under local rules).

<u>FACTUAL BACKGROUND AND PROCEDURAL HISTORY</u>

Sanders resides in New York, New York.[9]  LiveOn is an OPO located in New York, New York.[10]

The events underlying this lawsuit arise from the death of Sanders' son, Cedric McEaddy ("McEaddy").  McEaddy suffered a gunshot wound on May 18, 2016, and in the early hours of May 19, 2016, he was transported the Emergency Department of Brookdale University Hospital and Medical Center ("Brookdale").[11]  He was pronounced dead at 12:33 AM, and the OCME was notified of McEaddy's death at 1:14 AM.[12] Brookdale first contacted LiveOn about McEaddy's death at some time after 2:00 AM.[13] It did not provide his name or other identifying information to enable LiveOn to move

---

Sanders' counterstatement of facts does not directly respond to LiveOn's Rule 56.1 statement.  (*See generally* Pl.'s Rule 56.1 Statement).  Nonetheless, the Court will not consider portions of LiveOn's Rule 56.1 statement that are not facts supported by the record.  For example, the Court will not consider assertions for which no citations to record are provided (*e.g.*, Rule 56.1 Statement of Undisputed Facts dated Nov. 24, 2020 ("Def.'s Rule 56.1 Statement"), attached to Mot., Dkt. No. 183 ¶¶ 1, 2); that are merely legal arguments, (*e.g.*, *id.* ¶¶ 6 ("[I]t will be evident to this court that LiveOnNY did not recover tissue or organs from the plaintiff's decedent and that it in no way interfered with the plaintiff's possession of the body."); 30 (stating LiveOn never had "control over" McEaddy's body)); or directly contradicted by or not patent from evidence in the record, (*e.g.*, ¶¶ 27, 29–30 (contending that it is clear from the OCME's records that LiveOn had no control over McEaddy's body after 10 AM; *see also infra*)).

[9] Am. Compl. ¶ 1.

[10] *Id.* ¶ 5; Def.'s Rule 56.1 Statement ¶ 8.

[11] Am. Compl. ¶ 13; Ex. A to Am. Compl. ("Brookdale ED Record"), Dkt. No. 54; Investigation Report dated May 19, 2016, attached as Ex. D to Am. Compl., Dkt. No. 54, at 1); Def.'s Rule 56.1 Statement ¶ 7; Pl.'s Rule 56.1 Statement ¶ 1.

[12] Brookdale ED Record; Def.'s Rule 56.1 Statement ¶ 7.

[13] Def.'s Rule 56.1 Statement ¶ 9; *accord* Pl.'s Rule 56.1 Statement ¶ 2.

forward with potential organ and tissue donation.[14]  Brookdale again contacted LiveOn

after 6:00 AM and, at that time, provided LiveOn with McEaddy's name and relevant

medical history so that LiveOn could begin to determine whether McEaddy was a

candidate for tissue donation.[15]  Brookdale did not provide LiveOn any information

about McEaddy's next of kin, including Sanders' contact information.[16]

At around 6:45 AM, LiveOn contacted the OCME and asked that office to place a

"hold" on McEaddy's autopsy.[17]  The OCME agreed to place a hold until 10:00 AM.[18]

LiveOn was unable to determine McEaddy's next of kin.[19]  LiveOn called the OCME

again at 7:42 PM to release the hold.[20]  The next day, May 20, the OCME performed an

autopsy on McEaddy's body at around 8:00 AM.[21]

---

[14] Def.'s Rule 56.1 Statement ¶ 9.

[15] Am. Compl. ¶ 20; Def.'s Rule 56.1 Statement ¶¶ 11–12, 15; Pl.'s Rule 56.1 Statement ¶ 3; Def.'s Reply Rule 56.1 Statement ¶ 3.

[16] Def.'s Rule 56.1 Statement ¶¶ 12–13.

[17] *Id.* ¶¶ 16, 18–19; Pl.'s Rule 56.1 Statement ¶ 16; Def.'s Reply Rule 56.1 Statement ¶ 16.

[18] Def.'s Rule 56.1 Statement ¶ 18; Pl.'s Rule 56.1 Statement ¶ 16; Def.'s Reply Rule 56.1 Statement ¶ 16; Case Notes dated May 19, 2016 ("OCME's Case Notes"), attached as Ex. I to Am. Compl., Dkt. No. 54 at 1 (indicating "hold until 10 am possible o/d no extend").

[19] Def.'s Rule 56.1 Statement ¶¶ 24–26.

[20] *Id.* ¶ 27.

[21] *Id.* ¶ 29; OCME's Case Notes (indicating autopsy was conducted at 8:05 on May 20, 2016).

Sanders was not permitted to identify her son's body (via photograph) until May 21.[22]  She alleges that she was unable to view her son's body in person until May 28, and when she did so, his body was severely mutilated.[23]  Sanders alleges that LiveOn's actions—placing the hold and allegedly conducting an unauthorized autopsy—caused her mental anguish and suffering.[24]

Sanders commenced this action on August 8, 2016.[25]  Sanders brought claims under 42 U.S.C §§ 1981, 1983, and 1985 for due process and equal protection violations, and for negligent interference with a dead body, loss of sepulcher, medical malpractice, hospital negligence, failure to notify her of her son's death, and breach of duty of care against LiveOn.[26]  On August 10, 2018, LiveOn moved to dismiss the case against it pursuant to Rules 12(b)(6) and 12(c), or, in the alternative, for summary judgment.[27] The Court declined to convert the motion to dismiss to a motion for summary judgment, but instead granted LiveOn's motion to dismiss the § 1981, 1983, and 1985 claims, exercised supplemental jurisdiction over the remaining state law claims, and dismissed

---

[22] Am. Compl. ¶ 18; Identification dated May 21, 2016 ("Identification"), Ex. G to Am. Compl., Dkt. No. 54; *accord* Def.'s Rule 56.1 Statement ¶ 31.

[23] Am. Compl. ¶¶ 38–41; Pl.'s Rule 56.1 Statement ¶ 9.

[24] Am. Compl. ¶¶ 29–30.

[25] Compl.

[26] Am. Compl. ¶¶ 63–77.

[27] LiveOnNY's Notice of Mot. to Dismiss Pursuant to Rule 12(b)(6) and (c), or in the Alternative, for Summ. J. Pursuant to Rule 56 dated Aug. 9, 2018, Dkt. No. 36.

all but the loss of the right to sepulcher claim.[28]  The loss of the right of sepulcher claim is the only remaining claim.

LiveOn filed a motion for summary judgment on January 14, 2021 on this remaining claim.[29]  On January 21, 2021, Judge Amon referred the motion to the undersigned for report and recommendation.[30]

DISCUSSION

I.  <u>Liability for the Loss of Right of Sepulcher</u>

The right of sepulcher arises under New York common law.  *See Shipley v. City of New York*, 25 N.Y.3d 645, 653 (2015).  The right "gives the next of kin the absolute right to the immediate possession of a decedent's body for preservation and burial or other disposition of the remains, and damages may be awarded against any person who unlawfully interferes with that right or improperly deals with the decedent's body." *Toppin v. Town of Hempstead*, 121 A.D.3d 883, 884 (2d Dep't 2014) (quoting *Mack v. Brown*, 82 A.D.3d 133, 137 (2d Dep't 2011)).  "The right itself 'is less a quasi-property right and more the legal right of the surviving next of kin to find "solace and comfort" in the ritual of burial.'" *Shipley*, 25 N.Y.3d at 653 (quoting *Melfi v. Mount Sinai Hosp.*, 64 A.D.3d 26, 32 (1st Dep't 2009)).  "Damages are limited to the emotional suffering, mental anguish and psychological injuries and physical consequences thereof experienced by the next of kin as a result of the interference with the right of sepulcher." *Id.*  "[T]o recover for such emotional injuries, it must be shown that the injuries were

---

[28] Mem. & Order dated Sept. 30, 2019, Dkt. No. 133.

[29] Mot.

[30] Order Referring Mot. dated Jan. 21, 2021.

'the natural and proximate consequence of some wrongful act or neglect on the part of the one sought to be charged.'" *Mack*, 82 A.D.3d at 138 (quotations omitted).

To establish loss of right of sepulcher, a plaintiff must show that:

> (1) plaintiff is the decedent's next of kin; (2) plaintiff had a right to possession of the remains; (3) defendant interfered with plaintiff's right to immediate possession of the decedent's body; (4) the interference was unauthorized; (5) plaintiff was aware of the interference; and (6) the interference caused plaintiff mental anguish, which is generally presumed.

*Stanley v. City of New York*, 71 Misc. 3d 171, 177 (Sup. Ct. 2020) (quoting *Shepherd v. Whitestar Dev. Corp.*, 113 A.D.3d 1078, 1080 (4th Dep't 2014)); *accord Melfi*, 64 A.D.3d at 39 ("[W]e find that for a right of sepulcher claim to accrue (1) there must be interference with the next of kin's immediate possession of decedent's body *and* (2) the interference has caused mental anguish, which is generally presumed.").  Examples of such interference include an "unauthorized autopsy," the "dispos[al] of the remains inadvertently," or a "failure to notify the next of kin of the death."  *Id.* (citing *Darcy v. Presbyterian Hosp.*, 202 N.Y. 259, 262–63 (1911); *Finley v. Atl. Transp. Co.*, 220 N.Y. 249, 257–58 (1917); *Correa v. Maimonides Med. Ctr.*, 165 Misc. 2d 614 (Sup. Ct. 1995)).

Sanders alleges that LiveOn interfered with her right of sepulcher by placing an approximately 13-hour "hold" on her son's body on May 19, 2021.[31]  LiveOn does dispute that Sanders was McEaddy's next of kin or that she had a right to possession of his body. Rather, LiveOn contends that its "hold" does not amount to interference, both because it never had possession of McEaddy's body and because the OCME acted independently from LiveOn in providing access to McEaddy's body to Sanders.  Thus, although they do

---

[31] Opp'n at 2, 10–11, 16–17.

not dispute Sanders' mental anguish, LiveOn argues its actions could not, as a matter of law, have proximately caused that harm.[32]

LiveOn's arguments that it did not interfere with Sanders' right of sepulcher misapprehend the tort. LiveOn first argues that, because it never had possession of McEaddy's body, it could not have interfered with Sanders' right of sepulcher. But possession of the decedent's body has never been required to impose liability. "Interference can arise from a number of sources[.]" *Tinney v. City of New York*, No. 21154-2006, 2009 WL 8628936, at *1 (Sup. Ct. Dec. 16, 2009), *aff'd in part and modified on other grounds*, 94 A.D.3d 417 (1st Dep't 2012). As such, damages are available for anyone "who unlawfully interferes with that right *or* improperly deals with the decedent's body." *Shipley,* 25 N.Y.3d at 653 (emphasis added) (quoting *Mack*, 82 A.D.3d at 137); *accord Shepherd*, 113 A.D.3d at 1080; *Melfi*, 64 A.D.3d at 39; *see also, e.g.*, *Stanley*, 71 Misc. 3d at 177 (denying motion to dismiss for loss of sepulcher claim where decedent's body was not in possession of defendants). In other words, having possession of the decedent's body or remains—and thereafter improperly handling them—can amount to a violation of sepulcher rights. But that is not necessary. The critical component of interference is the ability to affect or control a next of kin's access to the decedent's body. And interference with that access can give rise to liability, even if the defendant never had actual possession of a body or remains. Possession by the defendant is not required; interference with the plaintiff's right to possession is.

Several cases illustrate the point.

---

[32] *See* Mem. at 14–17.

In *Stanley*, the OCME released the deceased's body to his biological family, rather than to his partner, as he requested. 71 Misc. 3d at 174–75. The decedent, a transgender Muslim man, did not want his biological family, which rejected his transgender and Muslim identity, to have any access to his body; he designated his partner to control the disposition of his body after death and to effectuate his cremation. *Id.* at 174. The OCME nonetheless released the decedent's body to his biological family, and his partner learned via Facebook that the family had scheduled a Christian funeral service. *Id.* at 174–75. After being contacted by his partner's attorney, the OCME resecured the decedent's body but proceeded to place an 11-day hold on access, contending that it needed the permission of the biological family to release it to his partner. *Id.* at 175.

The Court—in rejecting the OCME's motion to dismiss—noted that the *release* of the body triggered the interference. *Id.* at 181 ("OCME's unauthorized release of Frederick's body necessitated the [order to show cause], leading to an unnecessary and distressing multi-week delay in effectuating Frederick's wishes. At minimum, however, there is no dispute that Frederick's body was released, without authority, to his biological family for some period of time."). In other words, even though the OCME did not have possession of the decedent's body—indeed, it has been released to the wrong party—it could still be liable for interference. *Id.* at 179 ("[P]laintiff herself has alleged psychological harm stemming from OCME's improper release of Frederick's body, which then led to funeral planning by decedent's biological family which misgendered and deadnamed Frederick against Frederick and plaintiff's explicit wishes.").[33]

---

[33] To be sure, the OCME did later possess the body and place an 11-day "hold," but this was a separate act of interference.

Also, in *Shepard*, the decedent was crushed to death by a trash compactor and dumpster, but his body was never recovered. 113 A.D.3d at 1079. The decedent's brother brought a right of sepulcher claim against the machine operators, as well as the property manager and owners. *Id.* Their respective motions to dismiss this claim were denied and the Appellate Division affirmed. *Id.* at 1080. Had possession been a prerequisite for a right of sepulcher claim, that result would not follow—even if the operator of the compactor could be said to have had possession, the property owner and managers never did. Yet they were still potentially liable for interference, on the grounds that they also delayed (and failed) to return the decedent's remains to his kin (including by failing to conduct an adequate investigation of the accident). *Id.*

In *Rugova v. City of New York*, multiple defendants—including the New York City Police Department and four police officers, in addition to the OCME—were sued, when no family members of the decedent, who died in a car accident, were contacted prior to an autopsy. No. 303175-2009, 2013 WL 6219948, at *1 (Sup. Ct. May 24, 2013), *aff'd*, 132 A.D.3d 220 (1st Dep't 2015). The officers were held liable not because they performed an act related to the possession of the body, but because they failed to notify the next of kin. *Id.* at *2–3. Possession had nothing to do with the officers' liability.[34]

In *Gutnick*, one defendant—an organization that provides funeral services for "indigent New York residents of the Hebrew faith"—agreed to arrange a burial and funeral for the decedent (the plaintiff's father) consistent with the practices of the

---

[34] LiveOn misapprehends *Rugova,* suggesting that the police were held liable because they had possession of the decedent's body or custody of the decedent before he died. (Mem. at 10). But multiple officers were held liable—even those not at the scene of the crash—based on their failure to notify the next of kin. *Rugova*, 2013 WL 6219948, at *1, *4. And the decedent was killed in the accident, before any police officers arrived on the scene. *See id.* at *1–2.

Orthodox Jewish faith.  *Gutnick v. Hebrew Free Burial Soc'y for the Poor*, No. 509579/15, 2019 WL 3070839, at *1 (Sup. Ct. June 28, 2019).  The organization contracted with various funeral providers and entities to arrange transport, burial, and the religious service.  *Id.*  After the funeral, the casket was opened and revealed the body of an unknown woman, and the location of the decedent was unknown for several hours thereafter, but was later found to have been buried in another grave.  *Id.* at *2.  The organization moved for summary judgment, arguing "the claim of loss of sepulcher against it should be dismissed because it did not physically handle the decedent's body to cause mislabeling of the decedent's casket to occur."  *Id.* at *4.  The Court denied the motion, finding that interference with the right of sepulcher could still have occurred because the organization accepted a duty to the plaintiff by agreeing to provide funeral services.  *Id.*  Had possession been required, the organization would have prevailed.  But it did not, even though it never possessed the decedent's body.

In contrast, the cases to which LiveOn cites to suggest that "possession is a prerequisite to liability," (*see* Mem. at 9–12), including *Lando v. State*, 39 N.Y.2d 803 (1976) and *Fox v. Mark*, 181 A.D.3d 560 (2d Dep't 2020), *leave to appeal denied*, 35 N.Y.3d 917 (2020), say nothing of the sort.

In *Lando*, the decedent, a patient at Kings Park State Hospital, had grounds privileges—the ability to move around the grounds of the hospital—and failed to return to her ward one evening.  47 A.D.2d 972, 973 (3d Dep't 1975), *aff'd*, 39 N.Y.2d 803 (1976).  Her body was found 11 days later.  39 N.Y.2d at 805.  The Court of Appeals held that the trial court did not err in finding the hospital "negligently failed to undertake a careful and diligent search" to locate the patient.  *Id.* at 804.  Nor was it error to find that the plaintiff was entitled to damages for the hospital's interference with his access

to and control over the decedent's body.  *Id.* at 804–05.  Nothing in the case suggests that the Court of Appeals considered—or believed it was necessary to show—whether the defendant had possession of the decedent's body before imposing liability.  Nor did the court discuss whether the hospital had custody of the decedent's body at the time of her death.  If anything, the case establishes a principle contrary to the one LiveOn espouses: possession of the decedent's body is not required.  In *Lando*, the hospital *lacked* possession of the decedent's body—as a result of failing to locate it—and yet the court found it interfered with plaintiff's possession and right of sepulcher.[35]

And *Fox* is likewise unavailing.  There, the decedent died in her home during the night; the next morning, her homecare provider came to her door but was unable to enter.  *Fox*, 181 A.D.3d at 562.  The homecare provider discussed the matter with her coordinator and eventually left the home, without informing decedent's next of kin.  *Id.* The homecare provider returned the next day, was unable to enter the home, again discussed the matter with her supervisor, and left without informing any relatives.  *Id.* at 562-63.  The following day, the decedent's son discovered her body.  *Id.* at 563.  The Court affirmed the lower court's grant of summary judgment to defendants—the homecare provider organization, service provider, and various employees—on the loss of sepulcher claim, finding that the homecare provider did not have possession of the decedent's body, did not have the ability to access the body, and was not aware that decedent had passed away.  *Id.* at 562, 564.  The court determined the defendants "did

---

[35] To be sure, the hospital was supervising and had custody of the decedent.  But custody over a person pre-death is not the same as having possession of a body after death.  And LiveOn's attempt to create a category of cases where a liable party had "custody" prior to death merely demonstrates that the requirements for a sepulcher violation are a fiction of their own making, not based on the actual law.

not unlawfully interfere with the next of kin's right to the immediate possession of the decedent's body for preservation and burial." *Id.* at 564. In finding that as a factual matter the homecare provider lacked possession, the Appellate Division was not announcing a new requirement for the law of sepulcher. It may have been that the absence of possession was pertinent to finding that no liability could have been imposed; but in no way did the Appellate Division establish a *per se* rule that in the absence of possession, a right of sepulcher claim must be dismissed. Nor could it have set forth such a rule—as a plethora of cases demonstrate, *supra*, at common law, interference can exist even when the defendant does not touch the decedent's body or it cannot be found. Possession of the decedent's body by the defendant is not the *sine qua non* of a viable right of sepulcher claim. No case sets forth such a requirement.

LiveOn's next argument—that it did not interfere with Plaintiff's right to sepulcher, but the OCME, if anyone, did, (Mem. at 13–14)—ignores the factual record. (The Court interprets this argument as an attempt to achieve summary judgment on both the interference and causation elements of a sepulcher claim). LiveOn contends that while it requested a hold on the autopsy so it could attempt to identify McEaddy's next of kin, it was the OCME that granted the hold, (*id.* at 13), and it was the OCME that stated (and thus decided) the hold would last until 10:00 AM on May 19, (*id.* at 13–14; Decl. of Georges E. DeVastey dated Aug. 6, 2018 ("DeVastey Decl."), attached as Ex. E to Decl. in Supp. of LiveOnNY's Mot. for Summ. J. dated Nov. 25, 2020 ("Decl. in Supp."), Dkt. No. 183-1 ¶ 13). LiveOn further contends that after 10:00 AM, any further delay in the OCME's ability to take possession of McEaddy's body (which occurred on or after 7:00 PM on May 19) was not a result of LiveOn's actions, but attributable either to the OCME or the hospital. (Mem. at 14–16).

But the evidence in the record suggests, at a minimum, that LiveOn's version of events is subject to material dispute, and its role is not as limited as it wishes or suggests. LiveOn's own policy makes clear that a "hold" on a potential organ or tissue donor's body is a communication to the hospital and the OCME to "delay" any action on their part, so the potential donation opportunity is preserved:

> While we're on the phone with the hospital, determine if it's a medical examiner case and tell both of those entities that we are considering this patient for donation and to please put a hold so they do not pick up the body and proceed with their activities. And we do that in order to preserve the opportunity to donate while we do two things, establish medical suitability and speak with the next of kin.

(Dep. Tr. of Kristin Delli Carpini dated Oct. 20, 2020 ("Carpini Tr."), attached as Ex. G to Decl. in Supp., Dkt. No. 183-1 at 29: 14–:23).[36] Medical examiners are to be informed "that the deceased is being evaluated for possible tissue donation[.]" (*Id.* at 70:07–:08 (quoting Standard Operating Procedure: Communicating with Hospitals and Funeral Homes and Placing and Maintaining Holds, attached as Ex. D. to Mot., Dkt. No. 181 at 11)). LiveOn's policy is to periodically update either the OCME or the hospital "to let them know to still keep the hold on," or whether it "will be releasing the hold." (*Id.* at 50:21–51:08).

With respect to McEaddy, LiveOn received a "referral" after 6:00 AM on May 19. (*See id.* at 35:08–:10). LiveOn reached out to the OCME, first at 6:45 AM, and then at 10:00 AM. (*Id.* at 27:21–:22; 48:14–:15). And LiveOn "w[as] putting the hold so that

---

[36] There is no standard period of a time for a "hold." (*Id.* at 47:11–:22). And LiveOn's policy is not to ask the hospital whether someone is a potential organ or tissue donor; rather, it undertakes the responsibility to "determine suitability" for donation, and "every patient is a potential donor until more information is given." (*Id.* at 16:12–:19).

[LiveOn] could wait to see if a next of kin" was identified. (*Id.* at 47:19–:21). The hold was first granted until 10:00 AM. (*Id.* at 50:09–:13).

The testimony of LiveOn's own employee—Kristin Carpini ("Carpini"), the director of performance improvement and compliance—suggests that its hold caused a delay in the OCME's possession of McEaddy's body, and that the hold was released not at 10:00 AM, but at 7:42 PM.

First, Carpini confirmed that LiveOn's own notes indicate that from 10:00 AM forward there was a "hold" still in place. (*Id.* at 111:08–:13 ("So according to your review, at around 3 p.m., on May 19, 2016 did LiveOnNY have a hold on the deceased, Cedric's Mceaddy's [sic] body? A: Based on my review of the case, I don't have any notes from that time frame. But the notes I do have says that it was released at 7:42 p.m."), 115:14–:15 ("I don't know the details of what happened between that time as far as how *they continued the hold.*" (emphasis added)), 115:20–:24 (Q: And according to your review in this case, would you state that from 6 a.m. until approximately [1]9:42 p.m. is over a ten-hour hold? A: Based on my review, yes, that would be about an 11-hour hold."), 134:06–:10 ("A: "Are you asking me if we had a hold that long [from 6:39 AM May 19th until 7:42 PM]? Q: Yes. A: Based on my review, that is my assumption, because the hold was placed and then it was released.")). Although LiveOn's policy requires follow-up with the OCME every four hours once a hold is in place, (*id.* at 105:10–:14), there was no documentation suggesting such periodic follow-up occurred, (*id.* at 105:18–:19; 106:02–:04). That, combined with its notes that reference a release

at 7:42 PM, (*id.* at 102:09–:14), is consistent with, as Carpini herself concluded, LiveOn placing a 13-hour hold on McEaddy's body. [37]

Second, Carpini's testimony explained the effect of a "hold": to prevent any other action being taken with respect to the decedent's body, including an autopsy or funeral. (Carpini Tr. at 133:20–:23 ("If we kept a hold on the body, it was supposed to stay where it was that the beginning of that hold."), 135:10–:12 ("Our hold is to keep the process of the autopsy and funeral proceedings from starting so that we can preserve the opportunity to donate."), 137:03–:07 (Q: "Would that access have prevented the medical examiner from performing their duty until . . . LiveOnNY is able to locate[ ] a family member?" A: "Yes.  That's the purpose of it.")).

Third, the "hold" that was issued—which was obtained by first contacting the OCME's office—was LiveOn's to "release."  (*Id.* at 107:03–:06 ("Q: The question is, based on your review on Page 5 that at 19:42 LiveOnNY released the case back to the OCME.  A: Yes."), 150:14–:20 ("'Upon completion of case, the coordinator shall telephone the . . . medical examiner . . . to notify them of the final outcome of the case and inform them that the body of the deceased may be retrieved for funeral arrangements and/or autopsy in any database.'" (quoting LiveOn policy)), 151:09–:10 ("So we called [the OCME] to release the body.").

------

[37] The OCME's records are consistent with this timeframe.  The OCME's case notes state that a hold was in place until 10:00 AM on May 19, the OCME took custody of McEaddy's body at 7:09 PM on May 19, and the autopsy took place at 8:05 AM on May 20.  (OCME's Case Notes).  And the recorded phone call between LiveOn and the OCME conform the lifting of the hold at 7:42 PM.  (LiveOnNYCall4 ("LiveOnNY Call 4"), attached to Decl. of Michele Clayton Lucas Regarding Recorded Calls ("Lucas Decl."), Dkt. No. 183-5).

This testimony suggests that LiveOn's "hold" was long (almost 13 hours), and that there was no communication between LiveOn and the OCME during that entire period. And it also suggests that the "hold" may have prevented the OCME from taking any action with respect to McEaddy's body (including beginning the autopsy), since the "hold" is designed to halt action, and a release of the hold is initiated by LiveOn (not by the OCME telling LiveOn it is moving forward with an autopsy). If that was the case, it is plausible that LiveOn's hold caused a 13-hour delay in the autopsy, and, ultimately, Sanders' possession of her son's body.

LiveOn contends, in its Rule 56.1 statement and its briefs, that by the time LiveOn released its hold, the OCME "had long proceeded with its own activities." (Def.'s Rule 56.1 Statement ¶ 27). It cites to three pieces of evidence for that assertion. None support the claim, and, in some instances, they assist Sanders in defeating summary judgment. First, LiveOn cites to paragraph 16 of the declaration of Georges E. DeVastey. That paragraph confirms that, at 7:42 PM, LiveOn called the OCME; but it helps Sanders' theory of the case by documenting what occurred during the call: "LiveOnNY informed the medical examiner that they no longer need to hold off on the case (which is to say the body was administratively 'released' to the Medical Examiner)." (DeVastey Decl. ¶ 16). This declaration, in other words, shows that LiveOn told the OCME they did not need to keep a pause on their activities. (And notably, the LiveOn notes do not reflect any suggestion that during the call, the OCME said it had forged ahead despite not having heard from LiveOn. Nor does the audio recording of the call itself, apart from noting that the OCME already possessed McEaddy's body. (LiveOnNYCall4)). LiveOn also cites to Exhibit LONY005, the same document cited in paragraph 16 of the

DeVastey declaration, and the document merely confirms the 7:42 PM release by LiveOn ("NYC ME: released[.]"). (*See* DeVastey Decl. ¶ 16).

The final piece of evidence is an OCME document that notes various actions that the OCME took on May 19 and May 20. (OCME's Case Notes). Among other things, the document notes that the OCME took custody of the body at 7:09 PM on May 19. (*Id*.). This document certainly lists actions that the OCME took on that day, including transportation to multiple locations to obtain custody of McEaddy's body. To conclude that this exonerates LiveOn requires the Court to accept that interference with sepulcher requires possession of the decedent's body. That, of course, is not the proper understanding of the tort. *See supra*. Importantly, the OCME's case notes indicate that the autopsy of McEaddy's body did not take place until May 20. (OCME's Case Notes). And the autopsy is the event that the hold is intended to prevent from commencing, and the event whose delay Sanders alleges interfered with her ability to gain possession of her son's body. If the argument is that without possession of the body, the OCME would not have been able to commence its autopsy any earlier, and given the OCME's long delay in obtaining the body, LiveOn's "hold" did not cause a delay longer than otherwise would have existed, that is certainly not patent from the document. Even if that is how this document should be read, the conflicting testimony of LiveOn's witness, which

favors Sanders' theory that LiveOn's hold and release delayed Sanders' access, makes summary judgment inappropriate.[38]

LiveOn makes several other unavailing causation arguments. LiveOn first tries to latch onto the OCME's discretionary authority to prove that it must have been the OCME, not LiveOn, that placed a hold on McEaddy's body. (Mem. at 13–14). That the OCME has discretionary authority does not mean that LiveOn could not be liable. If LiveOn caused the OCME to exercise its discretion and extend the hold, that would subject it to liability. LiveOn need only be a proximate cause of interference of access, not the only cause of the interference. Proximate cause is not as LiveOn defines it. *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 56 (2d Cir. 2000) ("It's not necessary for a defendant's [actions] to be the sole or even the dominant cause of such injuries in order to be considered proximate cause. . . . Where more than one factor operates separately or together with others to cause an injury or disease, each may be a proximate cause if it is a substantial factor in bringing about that injury." (second alteration in original) (citing *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 109 (1983))); *City of New York v. Venkataram*, 396 F. App'x 722, 724 (2d Cir. 2010) (noting "the law's recognition that more than one factor may be a proximate cause of injury, particularly when factors operator together"). If LiveOn is trying to argue that the OCME acted independently of

---

[38] LiveOn also cites to this document to assert that after 10:00 AM the hold "would not" or could not be extended. (Def.'s Rule 56.1 Statement ¶ 28). The document does not say that; it contains the OCME's own notation "no extend," a sentence fragment that is unexplained and whose meaning is also not obviously what LiveOn ascribes. (OCME's Case Notes). And the phone call which that entry ostensibly memorializes makes no mention of any prohibition of an extension. (LiveOnNYCall3 attached to Lucas Decl., Dkt. No. 183-5). In any event, given LiveOn's testimony that the hold was, in fact, in place for 13 hours, summary judgment would not be appropriate based on this document. A jury could conclude from the LiveOn testimony that any intent to prohibit extensions was superseded by what actually occurred.

LiveOn, while the OCME certainly could have (that is the nature of discretionary authority), nothing in the record suggests it did.  That is, while the OCME may generally have the power to initiate action in the face of a hold by LiveOn, that is not the present case.  Quite to the contrary, the record suggests the OCME did not begin an autopsy until at least after LiveOn released its "hold."

LiveOn's other causation arguments have nary a citation.  (Mem. at 14–16).  It argues that, even if LiveOn had not placed a hold on McEaddy's body, "there is no evidence [the police and hospital] would have released it any earlier."  (*Id.* at 15–16).  But this argument is purely hypothetical.  LiveOn did place a hold, and there is some evidence—from LiveOn's own witness—that that the hold prevented the OCME from progressing earlier than 7:42 PM.  To be sure, there is other evidence to suggest that perhaps the OCME was itself delayed for other reasons—including not taking possession of the body until 7:09 PM.  The actions of the OCME, however, are unexplained in this record.  No deposition of the OCME was ever taken by LiveOn; no interrogatories appear to have been served.  So, the Court has no way of determining why the OCME did not take possession of McEaddy's body until 7:09 PM or did not begin his autopsy until the next morning.  In other words, the Court lacks any evidence to conclude, as a matter of law, that the OCME's delay was unrelated to LiveOn's hold.  As the movant, LiveOn was obligated to produce evidence to support the contention that its hold had no effect on Sanders' access to her son's body.  *Green v. Iacovangelo*, 184 A.D.3d 1198, 1201 (4th Dep't 2020) ("The hospital defendants contend that plaintiffs did not raise an issue of fact with respect to causation because plaintiffs did not become aware of decedent's death until three weeks after her death—when the hospital defendants no longer had decedent's body and could no longer interfere with plaintiffs' right to her remains.  We

reject that contention[.]"), *leave to appeal denied*, 35 N.Y.3d 917 (2020). It did not. All the Court is left with is the deposition testimony of LiveOn's own employee—which suggests only that the hold did have an effect, not the absence of one.

LiveOn also contends that it cannot be liable because Sanders did not get to see her son's body for days and this "certainly would not have had anything to do with a long-expired hold that only involved the [OCME]'s transportation and autopsy." (Mem. at 16). Again, this argument has no citation to the record. And it again confuses arguments that should be made to a jury with those appropriate for summary judgment. It is not disputed that that Sanders lacked access to her son's body for several days. But for the Court to conclude that lack of access was due solely to the acts of parties other than LiveOn would require undisputed material facts, which have not been presented. The record as presented to the Court establishes that the OCME showed a picture of McEaddy to Sanders on May 21, when she positively identified her son. (Identification). LiveOn would like the Court to conclude that even in the presence of the hold, Sanders would not have been able to identify her son's body any earlier than May 21 and would have not received access to it earlier than May 26. But no testimony from Sanders, the OCME, or any other party or witness is offered to indicate that LiveOn's hold had no effect on the timing of those decisions or that they would have occurred on the same timeframe regardless. No document is cited to support that assertion. A lawyer's argument, no matter how vehement or forceful, cannot stand in substitute for record evidence at summary judgment. The record here suggests that LiveOn's hold delayed action by the OCME, which had in turn, the effect of delaying Sanders' access to her son's body.

And this is why, quite contrary to what LiveOn motion suggests, proximate causation is not an issue to be decided at summary judgment in right of sepulcher cases. *See, e.g.*, *Cansev v. City of New York*, 185 A.D.3d 894, 896 (2d Dep't 2020) (finding "triable issues of fact as to whether the delays in informing the plaintiff that the decedent had been identified and in informing the plaintiff of the location of the decedent's burial interfered with the plaintiff's right of sepulcher"); *Rugova*, 132 A.D.3d at 231 ("As to plaintiffs' claim of loss of sepulcher, whether the approximately 36-hour delay in informing the next of kin that they could take possession of decedent's remains caused any interference with the family's burial rights . . . is an issue that presents a clear question for the trier of fact."). Even if, as LiveOn seems to suggest, its hold did not amount to a delay of any consequence, that does not entitle it to summary judgment. "The length of time that the next of kin were deprived of the decedent's body and its resulting interference with immediate possession and burial are issues of fact[.]" *Rugova*, 2013 WL 6219948, at *4.

There are therefore material facts that suggest LiveOn's actions caused a delay in the OCME's autopsy (and thereby delayed Sanders' right to possess her son's body). And it would be inappropriate to grant summary judgment to LiveOn on the issue of causation or interference.

       *               *               *               *

Two points run in LiveOn's favor, although they do not entitle LiveOn to summary judgment. First, LiveOn did not conduct an unauthorized autopsy or harvest any of McEaddy's organs without permission. There is no reasonable material dispute of fact on this. McEaddy died more than five hours before Brookdale provided LiveOn with McEaddy's name and medical history, thus making him ineligible for organ

donation.  (Def.'s Rule 56.1 Statement ¶ 22; DeVastey Decl.¶ 6).  As for tissue donation, although LiveOn sought authorization, McEaddy was not a registered donor, and LiveOn could not identify next of kin to obtain consent for such donation.  (Def.'s Rule 56.1 Statement ¶¶ 23–26; DeVastey Decl. ¶¶ 9–17).  And there is no evidence in the record that LiveOn ever came to possess McEaddy's body, and therefore it had no ability to actually take any actions to facilitate donation of any organs or tissue.  LiveOn did not harvest organs or tissue from McEaddy's body.  (Def.'s Rule 56.1 Statement ¶ 26; DeVastey Decl. ¶¶ 18–19).  Sanders argues that there is no evidence to show that organs and tissue were *not* removed from McEaddy's body, (Pl.'s Rule 56.1 Statement ¶ 20), but does not offer evidence to create a genuine dispute as to whether organs or tissue were harvested.  Thus, there is no genuine dispute regarding whether LiveOn harvested organs or tissue.

Second, LiveOn contends that it should not be liable for any delay in notifying Sanders as McEaddy's next of kin.  Parties can be found to have interfered with an individual's immediate possession of a decedent's remains "by failing to notify next of kin of the death."  *Melfi*, 64 A.D.3d at 39.  The Court does not read Sanders' summary judgment papers to be asserting a notification delay claim against LiveOn.  (*See, e.g.*, Opp'n at 18 ("The claim of Loss Right of Sepulcher is not against LiveOnNY['s] failure to notify[.]")).  But, in any case, there is nothing to suggest that LiveOn had a duty to notify Sanders of her son's death, and the Court is not aware of a case requiring such a notification by an OPO, as opposed to a hospital.

Notwithstanding LiveOn's prevailing on these points, since there is a material issue of fact as to whether its hold interfered with Sanders' right of sepulcher, summary

judgment is inappropriate on the claim.  The Court next addresses LiveOn's claim of immunity and similarly concludes that LiveOn is not entitled to summary judgment.

## II.   LiveOn's Immunity Under New York Public Health Law § 4306

Section 4306 of New York's Public Health Law provides immunity from liability to persons involved in organ donation if they act in "good faith" to comply with either New York or another state's requirements regarding such donation.  N.Y. Pub. Health Law § 4306(3) (2016) ("A person who acts in good faith in accord with the terms of this article or with the anatomical gift laws of another state is not liable for damages in any civil action or subject to prosecution in any criminal proceeding for his act.").[39]  Article 43-A sets forth the procedures an OPO must follow when attempting to facilitate organ or tissue donation.  After being contacted about a potential donation, the OPO "shall, in consultation with the hospital, . . . determine suitability for organ, eye and tissue donation" and "shall contact the appropriate eye bank or tissue bank with respect to suitability for eye or tissue donation."  *Id.* § 4351(2) (2016).  And where the potential donor has not given authorization for organ or tissue donation, the law provides that consent be sought from the next of kin.  *Id.* § 4351(4).  "The person initiating the request shall be designated by a hospital and shall be a representative of a federally designated organ procurement organization, eye bank, tissue bank, or a designated requestor."  *Id.* § 4351(7).

---

[39] A "person" is "an individual, corporation, government or governmental subdivision or agency, business trust, estate, trust, partnership or association, or any other legal entity."  N.Y. Pub. Health Law § 4300(6) (2016).  Various provisions of Articles 43 and 43-A have been recodified, superseded, or repealed in 2019, and unless otherwise noted, citations herein are to the version of the statute in effect at the time of McEaddy's death.

LiveOn maintains that it is immune from liability under Article 43 of the New York Public Health Law because it acted in "good faith" in "carrying out its statutory duty under Article 43." (Mem. at 17–18).

LiveOn misapprehends the immunity accorded by section 4306. Immunity is provided to those who act "in accord with the terms of this article," *i.e.*, Articles 43 and 43-A. (The immunity grant also extends to hospitals, cemeteries, and other institutions.) It does not provide blanket immunity to all actions taken by an OPO; rather, immunity only extends to those actions taken to comply with Articles 43 and 43-A. And Article 43-A does not address all acts taken in connection with organ donation. It only proscribes how an OPO is to determine suitability for and consent to donation.

> The statute now prescribes the duties of hospital administrators, organ procurement organizations, eye banks and tissue banks. Article 43-A also sets forth procedures for anatomical gift requests, and designates who may qualify as a "requestor" to "ensure[ ] that the request for [the] gift will be both effective with regard to organ procurement and sensitive to the needs of the family during a very difficult time."

*Colavito v. N.Y. Organ Donor Network, Inc.*, 8 N.Y.3d 43, 55 (2006) (alterations in original) (stating that section 4351, in Article 43-A, incorporates the good faith immunity provision of section 4306). To that end, "[s]ection 4351(4) obligates hospitals [and OPO's] to ask a deceased's family member (in a prescribed order of priority) to consent to the gift of all or part of the deceased's body, unless there is reason to believe that the deceased would have objected." *Id.* at 55–56. And immunity extends to those good faith attempts to ask a deceased's family members for consent to donation. *Id.*

This, however, is not a case that falls within Articles 43 and 43-A. As noted, Sanders is not making a failure to notify claim against LiveOn—that is, she is not

alleging that LiveOn did not notify her as a next of kin before proceeding with organ donation. And although she alleges that LiveOn went forward with nonconsensual organ donation and gathering, there is no evidence that LiveOn took any such action.

Instead, this case is about LiveOn's actions *vis-à-vis* the OCME, and how those actions interfered with Sanders' right to access her son's body. Consent to donate was not at issue, because at no time did LiveOn know McEaddy's next of kin and did not contact Sanders (or attempt to do so). The interference claim that survives here is not one based on an allegation that LiveOn failed to obtain consent, obtained consent to donate from the wrong person, or failed to follow a procedure set forth in Article 43-A. Instead, the claim is that LiveOn took actions to delay Sanders' right of access by not releasing its hold from the OCME. To that end, for all of LiveOn's conclusory assertions that it was attempting to comply in good faith with Article 43-A, it does not identify a single provision of the statute that covers its interactions with the OCME that Sanders alleges to have been improper. (Mem. at 17–18; LiveOnNY's Mem. of Law in Further Supp. of its Mot. dated Jan. 13, 2021, Dkt. No. 184 at 15–16).

Indeed, the cases cited by LiveOn demonstrate the limited reach of the Article 43 immunity and its inapplicability here. *Nicoletta* examined whether an eye bank and hospital acted in good faith in harvesting the decedent's eyes when an individual, who was not the decedent's next of kin, gave consent. *Nicoletta v. Rochester Eye & Hum. Parts Bank, Inc.*, 136 Misc. 2d 1065, 1066–67 (Sup. Ct. 1987). It was undisputed that the individual who authorized the organ donation was not the decedent's next of kin under the statute, but the eye bank and hospital believed she was, and as a result, thought they were acting in accordance with the statute. *Id.* The scope of immunity given was not a blanket immunity to all actions taken by the eye bank or hospital. The

Court instead examined the precise actions related to the consent to donation, and the provisions of Article 43 with which the eye bank and hospital were attempting to comply. There would have been no need to identify and tie plaintiff's allegations to specific provisions of Article 43 or to examine how the OPO's actions were ones authorized under Article 43, *see id.* at 1067, 1069, if the statute provided blanket immunity to all OPO activity.

Similarly, in *Mack*, a case involving not an OPO but a cemetery, the plaintiff, alleging to be the decedent's surviving spouse, sued defendant Green-Wood Cemetery Mausoleums & Crematory ("Green-Wood") for loss of right of sepulcher. 82 A.D.3d at 135–36. She alleged that Green-Wood improperly released decedent's remains to another individual, Brown, who also claimed to be the decedent's surviving spouse. 82 A.D.3d at 135–36. Analyzing a section of the New York Public Health Law not at issue here—section 4201, which concerns the disposal of remains—the court found that Green-Wood had acted in good faith in relying upon an authorization for cremation signed by Brown. *Id.* at 138–42. But again, like in *Nicoletta*, the defendant had identified a specific statutory obligation or duty that it was undertaking to meet, and although it had failed to carry it out properly, its good faith attempt to comply entitled it to immunity. And, again, the immunity was attaching to the defendant's attempt to obtain valid consent from a next of kin.

There is also nothing in the statute that suggests that the statutory immunity extends to all violations of the right of sepulcher. There are some violations of the right that would fall within the immunity grant. For example, as in *Nicoletta*, if an OPO that sought and obtained consent for donation, but that consent was—unbeknownst to the organization—fraudulent or invalid, then immunity would presumably attach. But in a

situation where consent is not even at issue, but alleged tortious conduct unconnected to any consent, the statute does not provide immunity from suit. Similarly, as *Mack* suggests, there are instances where a cemetery may be immune when it obtains consent for actions later deemed invalid. But cemeteries can also be found liable for violations of a right to sepulcher. *See, e.g.*, *Gutnick*, 2019 WL 3070839, at *4 (cemetery owner had not conclusively established that it had not interfered with right of sepulcher where decedent was incorrectly interred). If, as LiveOn suggests, the immunity applied to all actions undertaken in "good faith" by an OPO, then cemeteries—which are also entitled to that same immunity, *id.*—could never be liable for sepulcher violations. But they are. The tort has existed at common law and if the New York Legislature wished to extend immunity to all acts undertaken by an OPO, it could have done so. It did not.

Even if the Court assumes that the immunity provision did extend to the actions that LiveOn took here (under a theory, that all actions related to obtain consent to donation confer immunity, and the hold was such an attempt, even if it is not an action to fulfill a requirement of Article 43-A), LiveOn would still not be entitled to summary judgment. For one thing, LiveOn blithely asserts that it acted in good faith without explaining the meaning of the term or the standard by which good faith should be

measured.[40]  And here, the evidence is that LiveOn's hold extended well beyond the customary four hours, and that it violated its own policies by not contacting the OCME every four hours to extend the hold.  As a result, only after a 13-hour hold did the OCME move forward with its autopsy.  The violation of policies and the length of the hold—and the commensurate follow-on effect it had on Sanders' ability to access her son's body—could amount to an exercise of bad faith.

Such arguments are not, in any event, ones to be decided as a matter of law by the Court.  LiveOn—again citing to *Nicoletta*—argues that good faith is an issue of law to be decided by the Court.  (Mem. at 18).  That is incorrect.  In *Nicoletta*, the facts presented there permitted summary judgment; it does not follow that whenever the defendant

---

[40] In 2006, nearly twenty years after *Nicoletta*, the Second Circuit certified several questions to the New York Court of Appeals concerning Article 43 of the New York Public Health Law.  *See Colavito v. N.Y. Organ Donor Network, Inc.*, 438 F.3d 214 (2d Cir.), *certified question accepted*, 6 N.Y.3d 820, *and certified question answered*, 8 N.Y.3d 43 (2006).  Of note to this case, the Second Circuit stated it was "unsure" of the definition of good faith within Article 43, particularly whether acts could be performed both negligently and in good faith.  *Id.* at 231–33 (certifying question, "Does New York Public Health Law immunize either negligent or grossly negligent misconduct?").  The Second Circuit noted that New York courts had routinely found that negligent acts could have been performed in good faith.  *Id.* at 231.  (And noted that in other states immunity only accorded to those who acted *without* negligence.).  This uncertainty existed because, although section 4301(6) provides immunity to those who act in good faith, section 4351(7)—enacted after the immunity provision—provided that a person "shall be legally responsible for any negligent act" performed when carrying out duties under Article 43, like facilitating organ donation.  *Id.* at 231–32.

The Court of Appeals found that "section 4351(7) [of the New York Public Health Law] incorporates section 4306's good faith immunity provision and states that violators will be held responsible only '[t]o the extent permissible under such subdivision.'"  8 N.Y.3d at 56.  That cryptic pronouncement does not actually answer the question certified; and the Court of Appeals did not define "good faith" or to opine on whether it was a question of law or fact.  *Id.* at 57.  Instead, it "identified the problems associated with the paradoxical language of section 4351(7) to call it to the Legislature's attention."  *Id.* at 57 n.14.  Despite various amendments to the statute since 2006, the New York Legislature has not taken any action to clarify or define "good faith."

asserts the good faith defense, the Court is faced with a question of law for its sole resolution. *Hallam v. Mercy Health Ctr. of Manhattan, Inc.*, No. 03-CV-1177, 2005 WL 8160560, at *2 (D. Kan. Nov. 22, 2005) (citing *Nicoletta* in finding, "[t]he authority defendant has cited, however, can be clearly distinguished from this case. Those cases determined that no material facts existed and that the uncontroverted facts established that the defendants acted in good faith."); *In re Hum. Tissue Litig.*, 38 Misc. 3d 184, 201 (Sup. Ct. 2012) (denying motion for summary judgment and citing *Nunez v. N.Y. Organ Donor Network, Inc.*, 92 A.D.3d 594, 594 (1st Dep't 2012) in finding that good faith under section 4306 is an issue of fact).

CONCLUSION

For the foregoing reasons, it is respectfully recommended that the motion for summary judgment be denied. Any objections to the Report and Recommendation above must be filed with the Clerk of the Court within 14 days of receipt of this report. Failure to file objections within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); *Caidor v. Onondaga County*, 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate [judge's] report operates as a waiver of any further judicial review of the magistrate [judge's] decision.").

SO ORDERED.

*/s/ Sanket J. Bulsara* June 15, 2021
SANKET J. BULSARA
United States Magistrate Judge

Brooklyn, New York